### HARE *v.* THE STATE, 4 Howard, 187.

#### MURDER.

Where a person who was not a sworn officer was permitted to go into the jury room after the jury had retired to make up their verdict, in a capital case, and to have charge of them in the absence of the bailiff, it was held a sufficient ground for a new trial. [1]

The well established rule is, that wherever the circumstances of irregularity attending the deliberations of a jury *might* have affected the correctness or purity of the verdict, the verdict cannot be sustained; on the contrary, where those circumstances could *not* have influenced the jury in its determination, the verdict shall stand. [2]

TROTTER, J. Dissenting.

Error to Hinds circuit court.

At the May term of said court, 1839, William Hare, the plaintiff in error, was tried and convicted of the murder of Robert Sharp. A motion was made for a new trial by the prisoner, which was overruled.

The motion was supported by affidavits which disclosed these facts. When the case was submitted to the jury, they were placed in charge of a sworn officer, who took them to a hotel in the town of Raymond, at which there were many guests, and

[1] McCann's case, 9 S. & M., 465.

[2] Cornelius v. State, 7 Eng. 782; Ned & Taylor v. State, 9 S. & M., 465; Nelms v. State, 13 ib., 500; Boles v. State, ib., 398; Browning v. State, 33 Miss., 48; State v. Preston, 7 N. H., 287; State v. Fox, 1 Ga. Decisions, 35; State v. Peter, ib., 46; McLain v. State, 10 Yerg, 241; Hines v. State, 11 Humph., 597; 1 Iredell, 513; Wesley v. State, 11 Humph., 502.

there placed them in a room which did not admit of being fastened except on the outside. After they had been there some time, how long was not stated, a man by the name of Woodley went into the room unnoticed by the bailiff. That whilst he, the bailiff, withdrew to obtain water for the jury, he left them under the charge of Woodley; that he was absent seven or eight minutes, and that he left the door unfastened. It was proved further that Woodley was not a deputy sheriff, nor was he sworn to take charge of the jury. How long he continued in the room with them, did not appear. By the bill of exceptions it appears that the motion was made because Woodley was in the room with the jury, and conversed with them on the subject of the prisoner's guilt, and to establish this, the affidavit of one of the jurors was offered, which the court below rejected, and although the affidavit had a place designated in the bill of exceptions, yet by some omission, it was not copied.

Before the indictment was found, or the grand jury were sworn, the counsel for the prisoner filed a plea, challenging the array of the panel, on the ground that the same was not drawn at any regular term of the circuit court, or otherwise in pursuance of the statute. The court refused to receive this plea.

The prisoner also tendered a plea, setting out in substance that he "had before been arraigned and tried for the same offense, which was charged in the bill of indictment." This plea was likewise rejected and the opinion of the court excepted to.

The following errors in the proceedings of the court below were assigned by counsel for plaintiff in error :

1. The refusal of the court to hear the plea of the defendant challenging and objecting to the array of the panel for the reason that they were not drawn at the preceding regular term of the court, and recorded for the instruction of the prisoner according to the statute.

2. That there was no regular writ of *venire facias* upon which to bring in the panel.

3. That the writ of *venire facias*, whereon the said panel was brought into court, was issued without authority, and was therefore null and void.

*Hutchinson* for plaintiff in error.

The first point to be considered is, whether there was a lawful grand jury. The first assignment brings into review the array of the panel, the *venire facias* service and return, and the rejection of the plea to the array. Indeed, the plea itself presents the prominent objection. It was offered when the persons selected for a grand jury were about to be sworn. It is stated that the sheriff and clerk on the 18th of March, 1839, which will be judicially recognized as a day of the recess between the fall and spring terms of the circuit court, drew a number of persons to serve as jurors at the next term; and the clerk issued a written command to the sheriff to summon them accordingly. That they were freeholders or householders of the county, or were drawn out of the box *one* or *two*, or that the names were registered, does not appear.

It is surely no vain assumption that the grand jury is an essential auxiliary of the court of oyer and terminer, and jail delivery, and that without its preliminary action a prosecution and conviction for murder could not be sustained. The constituent elements of the grand inquest, as well as that of trial by jury, were, by our national and state constitutions, engrafted upon our civil polity; and, though the forms and modes of these institutions, owing to differences in our condition, habits and circumstances, differ from those of the nation from whom we derived them, the substance of them must be preserved. It cannot be too often or too urgently repeated, that they are the foundation pillars of that noble fabric of civil liberty which was reared by the Saxon race, and which each successive generation of that race has delighted to beautify and adorn.

But what are those constituent elements thus planted on constitutional foundations, and that must be preserved? There must be an authoritative and responsible source from which the panel is to emanate; each one in the array must be a freeman, at least in the civil division over which the court is to preside, and the inquest is to be taken; the panel must be registered or so published previously, as that those who are suitors, or to be tried, can have opportunity to make up knowingly challenges to the array or polls. 3 Black. Com., 355; 6 Bacon, 523–4.

In England, the sheriff arrayed the panel, and hence the

challenge to the array for his neglect, partiality or corruption ; 6 Bacon, 551, 552; 1 Chitty Cr. Law, 536, 537. Here, it is essential to the existence of the grand inquest that some officer, commission, or tribunal should be designated and empowered to select the jurors to be summoned. The act of 1830, Reprint, 304, gave a sure, safe and perfect mode of originating the panel; and adjudications of this court had scrupulously enforced its provisions. The freeholders and householders of the county were to be procured from the assessment rolls and deposited in a box. Then, at the court preceding that to which the *venire facias* was returnable, the sheriff and clerk, in open court, in the presence of the judge, were to draw the required number of names, rejecting the removed and ineligible. The panel thus drawn could not be a shuffled one. The public eye was open upon its inception. On this the *venire facias* issued, and the panel was registered for inspection. If the circuit court failed to sit, the sheriff and clerk repaired to the probate court, and the record-box was opened, and so the *modus operandi* excluded the probability of abuse. But the act of 1836 abrogated the challenge to the array and forbid a *venire facias* being quashed for any cause whatever in any court. Reprint, 578. Let us carry this stolid act into operation. No challenge to the array is to be had, and no *venire facias* to be quashed. What then ? Where are we to go for the panel ? To the act of 1830 ? We are constrained to do so because it is a dead letter. If we invoke it as a rule of action, no violation of its provisions, however monstrous, can be noticed. If a sheriff should return a panel of free negroes and mulattoes as good and lawful men, the judge, in obedience to the act of 1836, would make up his grand jury out of them. Would he reject a plea to the array ? He could not. Would he quash the *venire ?* Thus, then, it is we are putting our fellow-men upon trials of life and death, under a statute that gives us no panel out of which to form a grand jury, or on which to build petit juries for the trials of issues of traverse and of civil controversies.

Again, another element of the grand inquest to be preserved as we would sustain the institution itself, is that the jurors should have at least the qualification of being freemen. 6 Bacon,

524.   The act of 1830 requires freeholders or householders who are free white citizens.   But if this requisition be disregarded, under the latter act, it is no vice.   If the sheriff were to return a panel of young men, or such as were neither householders nor freeholders, a grand jury could be selected out of them, and under the latter act it would be quite sufficient.   Here, those on the panel are called *persons*.

So, too, it is necessary that the panel should be composed of citizens of the county.   6 Bacon, 559.   But as the challenge to the array no longer exists, and as no *venire facias* is to be vacated for any cause, a panel from Rankin or Warren would have answered to have passed on the indictment in this case, as well as if from Hinds.   There was nothing prior to the plea to the array to show from what county those persons came.

Abuses, at each step in the application of the statute in review, multiply and aggravate.   Our constitutions in bringing from Britain the institution of the grand jury, assuredly contemplated an *impartial inquest*.   But allow it possible, or even probable, that in some county there may be some temporary excitement, or some undue and formidable conspiracy, and that the sheriff, or whoever may choose to make a panel (for the act of 1836 appoints no person or mode for its emanation) should be very much prejudiced, or somewhat base, and should cull out a trained band to his own notion, your circuit judge is obliged to submit to it.   He is constrained to elect his grand inquest out of such material.   These illustrations could be readily increased.

There is still another important consideration.   It was a portion of the British scheme of grand and petit juries, that the panel should be arrayed and returned "weeks and months before the jurors were to appear," and for the very important reason and motive that the suitors and accused should have inspection of the names, that partialities, corruptions, affinities and the like, might be ascertained—and thus the trial, through the grand and petit juries, should be kept pure and sacredly devoted to the administration of public justice.   But what is the practice under the late act?   It is to make the list at any time—in any manner—no one knows or can know whether even

the clerk and sheriff coöperate.   In the present instance, the list
was made in March for May, instead of being drawn at the pre-
ceding term, and of being enrolled according to the act of 1830.
Instances have occurred where the judge gave an oral order,
after taking his seat, and a jury was got up for him in an hour.
Is this to be borne ?  Is it not plain that with such flagrant vio-
lations of the act of 1830, which is really the law in force, the
institutions of the grand jury and jury trial will sink into the
most shameful abuses, the extremest contempt, and become too
mean or too hurtful to be preserved ?  If you enforce the act
of 1836, you are obliged to consider the act of 1830 as suspended
and inoperative.  You cannot enforce the former with the power
to declare infractions of it illegal and void ; and that you cannot
do unless you have the power to entertain a challenge to the
array and to substantial defects in the *venire facias*.  But as it
has been shown that an enforcement of the latter act necessarily
involves a subversion of the constituents and essential elements
of the grand inquest and trial by jury, as secured to us by
the fundamental law, this court is constrained to declare it un-
constitutional and void.  And this being done, it will be plain
that the panel was illegal, the *venire facias* void, the grand jury
unlawful, and that the indictment in this case must fall.

Challenge to the array may be made by the prisoner before
the finding of the indictment ; and the proper time is between
the appearance and swearing of the grand jury.  So it was
made here.   1 Chitty Cr. Law, 309, 544, 545 ; 1 Burr's trial,
38 ;  Ross v. State, 1 Blackf., 318 ;  Hudson v. State, ib., 318 ;
Commonwealth v. Clark, 2 Brown, 323 ;  People v. Jewett, 3
Wend., 314 ;  Commonwealth v. Smith, 9 Mass., 109 ;  McClure
v. State, 1 Yerg., 206 ;  Commonwealth v. Knapp, 10 Pick., 477 ;
Hooker v. State, 4 Ohio, 450 ;  Gardner v. Turner, 9 Johns.,
261 ;  Pringle v. Hughs, 1 Cowen, 435, 436, note 1 ;  Common-
wealth v. Leppard, 6 Searg. & Rawle, 395 ;  Crane v. Dygett,
4 Wend., 675.

II. The plea of former trial, etc., ought not to have been
rejected.

III. A new trial ought to have been granted.   After the jury
retired under charge of a sworn officer, they, according to his

oath, ought to have been kept together in a convenient place (separated from the rest of the world) without meat, drink or fire, candles and water excepted, suffered to speak to no one, nor to the officer, nor he to them unless to ask if they had agreed, without leave of the court. They were conducted to a room in a tavern; the door for a period left open; they were put under the charge of one who was not an officer, nor sworn. He spoke to them. If these deviations are to be allowed, anything may be. King v. Moseley, etc., 18 Eng. C. & R., 115; Cochrane v. Street, 1 Wash., 79, 103; Howle v. Dunn, 1 Leigh, 455; Hale v. Cove, 1 Strange, 642; Metcalf v. Dean, Cro. Eliz., 189, 411; Blair v. Chambers, 1 Searg. & Rawle, 169; People v. Douglass, 4 Cowen, 26; Brant v. Fowler, 7 Cowen, 562.

*Foote*, on same side.

*Thomas F. Collins*, attorney general.

SHARKEY, C. J.:

Whilst the law is rigidly vigilant in guarding and preserving the purity of jury trials, yet it will not, for light or trivial causes, impugn the integrity of juries, or question the impartiality of their verdicts. But if the verdict be given under circumstances which might conduce to an improper influence, or the natural tendency of which might be to produce bias or corruption, it cannot then be said to be above suspicion; and if it be not, it must fall short of that perfection which the law requires, and which, under a more guarded administration, it is capable of producing. It is not necessary that any attempt should be made to bias the minds of jurors, or that any pernicious influence should be exerted. The door to tampering is to be closed; this is the only security; for if it be left open, it may be predicted with certainty that the evil consequences will fall somewhere.

This question has received repeated adjudications, and it will be sufficient for me to refer to some of the decided cases, in which the reasoning is, to my mind, conclusive, and the rule clearly defined.

In the case of the Commonwealth v. Roby, 12 Pick., 496, the question was very fully considered, and it is made so clear that

I shall give the language of the chief justice somewhat at length. In giving the general rule he says : " It is a well settled rule of practice incident to all jury trials, that after the jury are charged and have left the court to consider of their verdict, they are to be kept by themselves, without refreshment and without communication with others, until they have agreed.     Any departure from this rule is an irregularity ; but it is not every irregularity which will render the verdict void, and warrant setting it aside. This depends upon another and additional consideration, namely, whether the irregularity is of such a nature as to affect the impartiality, purity, and regularity of the verdict."

I might here pause and inquire, what irregularity will, and will not vitiate the verdict ?   The object of jury trials suggests the answer.   Common reason dictates to us what might affect the " impartiality, purity, and regularity" of a verdict, and whatever might have that effect, will vitiate it, as will appear from the conclusions of Judge Shaw.   After he has reviewed many of the authorities, he concludes by saying, " the result of the authorities is that when there is an irregularity which may affect the impartiality of the proceedings, as where meat and drink or other refreshments have been furnished by a party, or where the jury have been exposed to such influence, as where they have improperly separated themselves, or have had communications not authorized, there, inasmuch as there can be no certainty that the verdict has not been improperly influenced, the proper and appropriate mode of correction and relief is by undoing that which was improperly and may have been corruptly done; or where the irregularity consists in doing that which may disqualify the jurors from proper deliberation and exercise of their reason and judgment, as where the act done is contrary to the ordinary forms, and to the duties which jurors owe to the public, the mode of correcting the irregularity is by animadversion upon the conduct of the jurors or of the officers, but such irregularity has no tendency to impair the respect due to such verdict."   To me it seems that the line of distinction is here so clearly drawn, that it is impossible to mistake it, and so fortified by reason as to place it beyond doubt.   It is briefly this : If the purity of the verdict *might* have been affected, it must be set aside ; if it

could not have been affected, it will be sustained.  A verdict upon which doubts might rest cannot be good.  The same learned judge says, "it must command entire confidence."

The reasons here given run through all the decided cases.  In the case of the Commonwealth v. McCall, 1 Va. Cases, one of the jurors separated from his fellows, but for a few minutes, and spoke to no one about the trial, yet a new trial was granted. So in the case of McLain v. State, 10 Yerger, 241, in which a part of the jury separated from the balance for fifteen or twenty minutes pending the trial ; this was held sufficient ground for a new trial.  In neither of these cases was any such thing as a tampering with a jury shown.  The courts both held that to be unnecessary, and say that is sufficient that they might have been subject to improper influences.  In the last case the court said "there would be no safety in a different rule of practice, for it would be almost impossible ever to bring direct proof of the fact that it was done."  These decisions are evidently based upon the same principles with that first cited, to wit, that the purity of the verdict might have been affected.

In the case of Knight v. Inhabitants of Freeport, 13 Mass. R., 218, the verdict was set aside because a party indirectly interested spoke to one of the jurors and told him he was deeply interested in the case, and that it was a spiteful thing on the part of the plaintiff.  This case is only cited to show the degree of strictness necessary to make a valid verdict.  The court said "too much care and precaution could not be used to preserve the purity of jury trials."  This strictness is necessary to give due confidence to the parties in the results of their causes; and every one ought to know that for any, even the slightest inter-meddling with jurors, a verdict will be set aside.

In the case of Perkins v. Knight, 2 N. H., 474, the court say that "it is of the highest importance that jurors should be pre-served not only from all improper bias in causes, but even from the suspicion of improper bias."

It only remains to make an application of these principles to the case before us.  If, for a separation of the jury, which occasions a mere exposure to improper influence, a new trial will be granted, why should it not in the present case?  The thing to

be guarded against is improper influence.   Can it not be as well
exercised in the jury-room by an individual who has the art and
capacity to exercise it, as it can anywhere else?   Woodley was
with the jury, how long it is not known; who can say that he
did not speak of the guilt of the prisoner?   Who can say that
he had not influence, and that his influence was not exerted to
procure a verdict of guilty?   If it was legal for Woodley to be
with the jury, it would also be legal for any one else to be there.
Suppose that he had been the prosecutor, and an influential man,
could it be said, under such circumstances, that the verdict was
free from suspicion?   Could every one rely on it as the voice of
an impartial jury?   Can there be any difference between admit-
ting a stranger into the jury-room, and admitting him into the
company of the jury after they had dispersed?

To me it seems that all the evils are fully incurred by letting
an unauthorized person into the jury room, that could be incur-
red by letting them separate.   It seems to be a proposition too
clear to admit of a doubt, that in this way the verdict *might* be
tainted with corruption or bias.   If so, the rule which I have
before stated will apply.   It applies with all its force.   If the
sanctity of the jury room may be violated by an intruder, there
is an exposure to his influence, and when the opportunity has
been offered, no one can say that it has not been used.   The
verdict is opened to suspicion, and does not, nor cannot command
respect and confidence.   An artful man might infuse the poison
in a few words.   We cannot know that Woodley did not do so; or
even if we could be satisfied that he did not, another person, on
another occasion, might, and the law is to operate by general
rules.   If it were lawful for him to be there, it would also be
lawful for another person.   If lawful for one person, why not for
two or more?   One man may effect as much as more could.   It
is the duty of the court to swear an officer to take charge of the
jury; his oath is, that he will not speak to them or permit others
to do so.   How useless is this ceremony, if the officer may com-
mit the jury to the keeping of one who is not sworn.   Suppose
the court had called a mere by-stander who was not sworn, to go
out with the jury, would a verdict under such circumstances be
good?   It would not; and yet, are we to permit the officer to

leave the jury in an exposed room under the charge of any intruder that may thrust himself into the presence of the jury? Suppose twelve men had been admitted, who could say whether the verdict was the voice of those who had been sworn, or those who had not? and if one be admitted, certainly twelve might with the same propriety.  One man could exert all the art, ingenuity, and malice, that twelve could.  I must think that this verdict is within the rule.  The irregularity might have affected its purity.  I am therefore led to the conclusion that a new trial should be granted.

SMITH, J. concurred.

TROTTER, J. dissenting:

William Hare was indicted in the circuit court of Hinds county for the murder of Robert Sharp.

Before the indictment was found and the grand jury were sworn, the counsel for the prisoner presented a plea challenging the array of the panel from which the grand jury were selected, on the ground that the same was not drawn at any regular term of the circuit court, or otherwise in pursuance of the statute. The court refused to receive this plea.  The prisoner afterwards tendered a plea stating in substance, that he had *before been arraigned and tried* for the same offense which was charged in the bill of indictment.  The court refused to receive this plea likewise.  The cause was then submitted to a jury, who returned a verdict of guilty.  The prisoner moved the court to grant him a new trial.  It appears that after the evidence was closed, the jury retired under the care and charge of a bailiff, who conducted them to a room in one of the hotels in the town of Raymond, where the court was held.  That after they had been engaged some time in their deliberations, a man by the name of Woodley came into their room unobserved by the bailiff. Woodley had occasionally acted as a special deputy of the sheriff, and the officer who had charge of the jury was under the impression that he was then one of the deputies.  It appears, however, that he had no authority to be with the jury at that time. Woodley remained with the jury a few minutes whilst the bailiff retired to get them some water.  There is no proof that Woodley

did or said anything calculated to have any influence against the prisoner. The motion for a new trial was refused by the court.

The errors assigned are: 1st. The rejection of the plea which challenged the array. 2d. The rejection of a special plea of a former arraignment and trial for the same offense. 3d. The judgment of the court on the motion for a new trial.

1st. The record states that the panel of jurors for the term was drawn by the sheriff and clerk in vacation, without the assistance of any officer. This was irregular, for the act of 1830 provides that the *venire* shall be drawn, if in the circuit court, in open court, in presence of the judge, by the clerk and sheriff; but if this shall be omitted, the same may be afterwards done by the clerk and sheriff in the presence of the judge of probates. The plea should, therefore, have been received, unless the act of 1836 can be considered as an answer to the objection which was stated and relied on. The first section of that act provides that no challenge to array shall be sustained, nor shall any *venire facias* be quashed by any court of justice in this state. There is a proviso that in capital cases any *venire facias* may be quashed for partiality or corruption in the officer summoning the jury, etc. This act is a direct authority for the rejection of the challenge in this case. This court was zealously invoked to disregard the provisions of this law, which were denounced in the argument as an unconstitutional and dangerous infringement on the right of jury trials. The constitution of our state has asserted the importance of this institution, and guarded it with emphatic terms from the danger of violation. In this day, and in this country, there can be, I apprehend, but one sentiment on the subject. The right of trial by jury is universally looked upon as the most valuable and effectual bulwark of human rights. And no law which should deprive the citizen of this safeguard of his life, liberty and property, could receive the sanction of any court of justice. But I cannot regard the act of 1836 as subject to this objection. It does not take away the right, but only provides the method of enjoying it. It is true that its provisions are open to some observations on the score of policy. Abuses may sometimes grow out of it. But the remedy for this lies with the legislature, and not with this court. It is not deemed unconsti-

tutional, and under the liberal indulgence of the right of chal-
lenge to the polls, peremptory as well as for cause, it will not
often happen that this law will have the effect to deprive the
party of a jury not free from objections. The frequent instances
in which the whole panel for the term had been set aside on ac-
count of some mere technical objection to the form of process
of *venire facias,* by which justice was defeated, and litigation was
increased, was the cause of this law, and although it is very
broad in its terms, has yet proved highly salutary to the admin-
istration of justice. It has served to extricate justice from the
web of mere technical form, in which she is too often entangled.
In the case before the court, I can discover no ground for arrest-
ing the regular operation of the act. Should one of these extreme
cases, which were supposed by the prisoner's counsel, ever occur,
it will be the duty of the courts to pause and consider whether
it is within the spirit and meaning of the law, and to give to it
such interpretation as will vindicate the constitutional right of the
citizen, and uphold the public policy and justice of the country.

2. Very few remarks are deemed sufficient to dispose of the
second ground of error. The plea alleges, in substance merely,
that the prisoner had before been arraigned and tried for the
same offense. It does not aver either a conviction or acquittal.
It is, therefore, neither a plea of *autrefois acquit* or *autrefois con-
vict.* The plea was attempted in the argument to be sustained
on the authority of that great principle applicable to criminal
jurisprudence, that no man shall twice be put in jeopardy for
the same offense. There is no question as to the principle, and
it has been expressly sanctioned in this country by a constitu-
tional enactment. In the constitution of the United States it is
thus expressed: "Nor shall any person be subject for the same
offense to be twice put in jeopardy of life or limb." This phrase
is well known in the law, and is considered as descriptive of the
class of punishments inflicted for crimes amounting to a felony,
whether the punishment be loss of life or limb. And hence this
clause in the constitution is considered as equivalent to a decla-
ration that no man shall be twice tried for the same offense. In
the application of this maxim, it is important, however, in each
case to consider, whether the party who claims its benefits, has

been really put in jeopardy, and for the same offense. For a man may have been tried, and yet have been in no jeopardy, in the sense in which this term is understood at common law, and in the constitution. Thus if the court have no jurisdiction, no valid judgment could be rendered, and the maxim does not apply to a trial before such a tribunal. Or if the indictment was defective, so that no punishment could be awarded upon a conviction, or, if during the trial, a juror is suddenly taken ill, or dies, or the prisoner becomes so indisposed as not to be able to attend his trial, or from any other urgent necessity the progress of the trial is interrupted, another jury may be empanelled, and the prisoner again put upon his trial. And so when the prisoner has been convicted, and the judgment has been arrested at his instance, and likewise, when the jury cannot agree after the proper efforts, and there is no prospect of a verdict, and the powers of the court are about to terminate, and under this necessity they are discharged, the prisoner may again be put upon his trial. In all these cases, the prisoner may be said to have been in jeopardy by the first trial, and yet as the event has shown that there was no legal trial, he was not in jeopardy in the true sense of the maxim. See the case of the Commonwealth v. Roby, 12 Pick. R., 502; Bowden's case, 9 Mass. R., 494; People v. Goodwine, 18 J. R., 187; United States v. Perez, 9 Wheat, 579. Hence it is necessary in every plea which seeks for the prisoner the benefit of this maxim, to aver a conviction or acquittal, on a former trial for the same offense. This was so expressly held by the court of appeals of Kentucky, in the case of the Commonwealth v. Olds, 5 Lit. R., 139, in which a very lucid and satisfactory explanation is given of the maxim under consideration. Upon the two grounds of error which I have noticed, the other judges fully concur in opinion with me.

3. I come now to consider the objection to the verdict, which is the only remaining subject of inquiry; and regret that I cannot agree with the other judges on this point. This objection is rested on the single ground that Woodley was in the jury-room for a few moments, whilst they were consulting about their verdict. This man was an entire stranger to the prisoner, from aught that appears from the record, and there is no fact pre-

sented to the court upon which any imputation can be made against him on the score of interest or feeling. He is not shown to have had any motive to prejudice the cause of the prisoner, and he neither did nor said anything for or against him. The jury had no agency in procuring his absence, nor are they charged in anything with impropriety or misbehavior. Woodley was a mere intruder, nor is it shown that his presence was at all countenanced by the jury. Is this naked, dry fact, standing by itself on the record, sufficient to destroy the deliberate and solemn determination of the jury? I confess that I can see no pretext for giving it such influence either in principle or adjudged cases. On that principle I do not see how any verdict can stand. Verdicts may and should be set aside for a mistake in the jury, by which injustice has been done, or for corruption or partiality in any of the members of the jury; or for such misbehavior as naturally tends to affect the impartiality, purity and regularity of the verdict. It will not do to determine that every irregularity on the part of the jury will avoid their verdict. It is important to the welfare of society and the ends of justice, that impartiality and purity should mark the action of juries. Their verdict should command entire confidence. But it is equally essential to the harmony of society, that verdicts should not be lightly set aside. The law must repose some confidence in the honesty of juries, and the integrity of their verdicts, so much, at any rate, as not to presume any vice in them as such, until it is established by proof. To set aside the present verdict, this reasonable presumption must be entirely disregarded; nay, the court must indulge the contrary presumption. This I cannot consent to do. Nor have I been able to find one adjudged case which would require me to do it. For I have seen no case in which the verdict has been set aside, unless some misconduct or irregularity of the jury has been shown.

The ground on which the court is asked to vacate this verdict, is the mere impropriety of Woodley, a stranger. The case of the Commonwealth v. Roby, 12 Pick. R., 516, fully sustains the views which I have here expressed; and as this is the case on the authority of which the majority of the court have considered themselves bound to reverse the judgment in the present case, I will notice at length.

Roby was indicted for murder, and convicted. A motion was made to set aside the verdict, on the ground of irregular conduct in the jury. The irregularity complained of consisted of the following facts: After the jury had retired to consider of their verdict, and after they had been for some time engaged in their deliberations, some of them told one of the constables that they were faint, and asked him whether they could not obtain some refreshments; and the constable thereupon went to a grocer's shop and procured crackers and cheese, and two bottles of cider, which were carried into the jury-room by the constable and the grocer's boy; that while the constable and the boy were in the room, one of the jurors said that two bottles were not enough, and the constable told the boy to bring two more; the boy brought them and delivered them to the constable, who carried them into the room, etc. The court refused to set aside the verdict, on the ground that though it might have been an irregularity to drink cider and admit the boy in the room, yet it was not an irregularity for which the verdict could be avoided.

There was in that case an irregularity charged against the jury; in this case there was none. In that case the judge says, that the question whether misbehavior in the jury shall set aside their verdict, depends upon another question, and that is, whether the misbehavior or irregularity is of such a nature as to affect the impartiality, purity, and regularity of the verdict. Here the judge gives the rule and also a practical illustration of it, and he did not consider the irregularity complained of in that case as necessarily tending to affect the verdict. How, then, can this court hold that the irregularity of a mere stranger, in which the jury in no way participated, can affect the verdict?

In the conclusion of his opinion, Judge Shaw observes, that the result of the authorities is, that when the jury have so acted as to expose themselves to influences which may affect their verdict, as when they have improperly separated themselves, or had communications not authorized, then, as there can be no certainty that the verdict has been improperly influenced, the proper mode of correction is to set aside the verdict.

The rule is here laid down in terms as broad as possible for

the prisoner at the bar, and in terms much broader than what the judge in the preceding part of his opinion had allowed himself. For he has cited several authorities in his opinion to show that an unauthorized separation of the jury is no ground to reverse the judgment; and amongst others that of the King v. Kinnear, 2 Barn. & Ald., 462; St. John v. Abbott, Barnes, 441. He might also have referred to many other cases, to show the same doctrine, and where the judges have determined, that though it is a misdemeanor of the jury, for which they may be fined, yet it will not of itself vitiate their verdict. In the King v. Moseley *et al.*, 18 Eng. C. L. R., 115, this point was fully settled after full argument. But as there was no separation of the jury in this case, it is unnecessary to consider this point further. And it is quite evident to me that Judge Shaw could only have intended, at most, by the irregularity referred to in his concluding remarks, some positive act, such as an unjustifiable separation of the jury, or some actual unauthorized communication under circumstances tending to expose the jury to undue influences.

This case cannot, therefore, in my opinion, come within the rule thus laid down, any more than the case he was considering. The case of Park, in 2 Rolle R., 85, is identical in principle with the one at bar. In that case a juror was challenged and withdrawn, but went on with the jury and remained with them above half an hour; and yet the judges held that this, though a misdemeanor in the juror, for which he might be punished, yet of itself was not sufficient to set aside the verdict. This was as strong a case as the one at bar. That was surely a case where there was as much room for conjecture that improper influence had been exerted, as in the present case; yet the court very properly, as I conceive, refused to indulge in conjecture, or to visit upon the jury the impropriety or misbehavior of a stranger.

I am clearly of opinion that there is no ground for reversing the verdict.